[Crim. No. 19805. June 23, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
DANIEL CAUDILLO, Defendant and Appellant.

564

## COUNSEL

F. Elaine Easley, under appointment by the Supreme Court, for Defendant and Appellant.

Wilbur F. Littlefield, Public Defender (Los Angeles), Harold E. Shabo and G. Keith Wisot, Deputy Public Defenders, as Amici Curiae on behalf of Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Pounders and Michael Nash, Deputy Attorneys General, for Plaintiff and Respondent.

John K. Van de Kamp, District Attorney (Los Angeles), Harry B. Sondheim, Donald J. Kaplan and Eugene D. Tavris, Deputy District Attorneys, as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

JEFFERSON, J.*—As charged in a six-count information, a jury found defendant Daniel Caudillo guilty of the crimes of kidnaping (Pen. Code, § 207), forcible rape (Pen. Code, § 261, subd. 2), sodomy (Pen. Code, § 286), oral copulation (Pen. Code, § 288a), first degree robbery (Pen. Code, § 211), and first degree burglary (Pen. Code, § 459). The jury also found that defendant was armed with a deadly weapon, to wit, a knife, during the commission of each of these offenses (Pen. Code, § 12022). In finding defendant guilty of first degree burglary the jury also found (pursuant to Pen. Code, § 461) that in the course of the commission of this offense, defendant, with the intent to do so, inflicted

*Assigned by the Chairperson of the Judicial Council.

great bodily injury upon Maria—the victim of each of the offenses charged against defendant.[1]

Defendant was sentenced to state prison for each offense. The sentences for kidnaping, robbery, rape, sodomy and oral copulation were ordered to run concurrently with the burglary sentence. With the exception of the burglary sentence, all the sentences were stayed, pending determination of any appeal as to the burglary conviction, the stays to become permanent upon completion of service of the burglary term.

Defendant appeals from the judgment. His contentions all relate to the sufficiency of the evidence to sustain the judgment and findings. He first claims that there was insufficient evidence to support his conviction of any offense, a claim patently without merit. He also contends, and we agree, that the evidence adduced below of the movement of the victim was not of sufficient proportions to support the kidnaping conviction. Defendant makes a third contention, with which we agree—that there was insufficient evidence to support the jury's finding that, in the course of commission of the burglary, with intent to do so, he inflicted great bodily injury upon Maria, the occupant of the burglarized premises. We modify the judgment accordingly.

Due to the nature of the issues raised on this appeal, we set forth in some detail the evidence adduced below.

On May 2, 1975, Maria was sharing with Catherine a second-floor apartment in a large apartment complex in Montebello. Early in the morning on this date, after Catherine had left the apartment to go to work, Maria took the elevator to the subterranean garage where her car was parked. There she discovered that a tire on her vehicle was flat; she returned to the elevator intending to go to her apartment and summon help.

As she reached the second floor, the elevator stopped and the door opened. A man, later identified by Maria as defendant, jumped into the elevator and pushed her against the elevator wall, covering her mouth with one hand and pressing a carving knife to her throat. Maria was

---

[1]The information also alleged that defendant had suffered two prior felony convictions. On the People's motion the trial court struck the allegations as to one of the prior felony convictions. The defendant admitted the truth of the allegations as to the remaining felony conviction.

wearing glasses; she had an opportunity to observe defendant for 10 or 20 seconds, and recognized him as a person she had seen before around the apartment complex.

Defendant immediately asked Maria if she had seen him. He cautioned her to be very quiet and, when the elevator door opened again, took her to a small windowless storage room beside the elevator on the second floor. The storage room was located between the elevator and Maria's apartment. Defendant was holding the knife so close to Maria's throat that she sustained a slight cut to her throat. Maria tried to pull the knife away from her throat and, in the process, cut two of her fingers. At one point, defendant held the knife to the back of Maria's neck—causing a laceration to her neck.

Defendant again asked Maria if she had seen him. In fear of further injury, Maria assured defendant that she had not, although she remembered seeing him on April 13, 1975, at the apartment house pool; defendant had stared at her on that occasion, and had offered her his pool chair. Sometime later she had seen him in the apartment complex parking lot, working on an automobile.

While they were in the storage room, defendant removed Maria's glasses and never returned them. He asked her if anyone was in her apartment; she said no. Defendant told her that as soon as everyone had left for work he would take her there. While they waited, defendant ordered Maria to raise her dress; she did so, reluctantly, and defendant rubbed his hands against her backside. He also asked Maria how much money she had.

Maria testified that defendant kept her in the storage room for approximately 20 minutes. Then, pressing the knife in Maria's back, defendant moved her down the hall from the storage room to her apartment,[2] where Maria was compelled to open the door. She was pushed inside and blindfolded. After taking her to the bedrooms, defendant led her to the living room, where Maria heard him unzip his pants. He ordered her to undress. Defendant allowed Maria to keep on her panties, pantyhose and shoes; he directed her to "[t]urn around slowly." Then defendant, seated on the living room sofa, pulled Maria toward him, pushed her to her knees and inserted his penis in Maria's

---

[2]The record does not disclose the actual distance from the elevator to the storage room, nor how far that room was from the victim's apartment.

mouth. Maria gagged; she felt like vomiting. Then he ordered her to completely undress.

Defendant compelled Maria to stand, and inserted his fingers in her vagina. He asked her if she could get pregnant; she said she did not think so. Defendant then raped the victim.

Defendant asked Maria if she had a boyfriend. He said: "You better not lie to me. I know everything about you. I know what time you leave for work and I know what time you get home. I have seen you from afar and I have admired you for a long time." Maria stated that she had a boyfriend. Defendant wanted to know if Maria and her boyfriend engaged in sexual activity; Maria did not answer.

Defendant then inserted his penis in Maria's rectum. Maria pulled away, telling defendant she was going to be sick. Maria had diarrhea, and evacuated her bowels twice. Defendant kept insisting that Maria satisfy him.

Defendant again forced Maria to orally copulate him; she gagged and spit. He returned to the theme of whether or not she had recognized him; she continued to tell him she had not.

Defendant raped Maria for the second time, but could not ejaculate. He again forced her to orally copulate him, and ejaculated in Maria's mouth; Maria gagged, spit and vomited. Still not content, defendant again inserted his penis in Maria's mouth, wiping away his victim's vomit.

Finally, defendant pushed Maria to the center of Catherine's bed; Maria was still blindfolded, although loosely. He left the bedroom, returning several times to bring Maria her clothes, purse and wallet. He threw the wallet at her, and ordered her to sit up. Through the blindfold, she examined the wallet; money was missing. Defendant demanded more money, and Maria found more in the wallet, which she gave him. Defendant took it, saying "I'll owe it to you." He told her not to report his sexual attack upon her to anyone. "If you do report it to anyone it will be embarrassing for you only," said defendant. He threatened to kill her if she told anyone. Thereupon defendant departed, taking $60 of Maria's money with him.

Maria lay on the bed for about 30 minutes, with the blindfold still over her eyes. She was afraid to get up. She finally did so, and searched the

apartment room by room, making certain that defendant was gone. It was now 10:45 a.m. Maria called her boyfriend, Robert, and he arrived at the apartment about 11 a.m. She told him what had happened; it took him an hour to calm her down. Robert called the police.

Detective Carranza arrived and interviewed Maria. He showed her some mugshots, but defendant's picture was not among them. Later, Maria was able to identify defendant from looking at another group of photographs which included that of defendant. Maria's roommate, Catherine, also selected defendant's picture as the person who had approached Maria at the apartment house pool on April 13, 1975.

Dr. J. Richard Marshall testified that on the late afternoon of May 2, 1975, he was employed at the emergency care center at Beverly Hospital, Montebello, and examined Maria there. She was very upset, was weeping and agitated. He found what he described as two superficial knife cuts on Maria's neck, cuts which did not require suturing. He also found no visible injury, laceration or hematoma of the sexual organs or of the anus. Dr. Marshall took a slide which, after being analyzed, revealed that semen had been present in the victim's vaginal vault. He prescribed a mild tranquilizer, and Maria was discharged.

Defendant's defense was an alibi. He admitted visiting the victim's apartment building to see friends, but claimed that the charges against him were the result of Maria's mistaken identification.

I

### Sufficiency of the Evidence to Identify Defendant as the Perpetrator of the Charged Offenses

Defendant attacks the sufficiency of Maria's testimony to identify him as the perpetrator of the various offenses committed against her, claiming that her powers of observation were poor and without corroboration, and that her testimony is insufficient to sustain defendant's conviction of any offense.

■ "This court must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. . . . The test on appeal is whether there is substantial evidence to support the

conclusion of the trier of fact; . . ." (*People* v. *Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].) And it is the trier of fact—in the case before us, the jury—who had the duty of evaluating the credibility of the witnesses.

■ We note that "[i]n California conviction of a sex crime may be sustained upon the uncorroborated testimony of the prosecutrix. [Citations.]" (*Ballard* v. *Superior Court* (1966) 64 Cal.2d 159, 171 [49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416].) Under present law, no special burden is placed upon such a prosecutrix, unshared by other witnesses in a criminal case, insofar as offering proof of the crime is concerned. (*People* v. *Rincon-Pineda* (1975) 14 Cal.3d 864 [123 Cal.Rptr. 119, 538 P.2d 247].) Any "[c]onfusion, or lack of clarity and positiveness in a witness' identification testimony goes to [its] weight, . . ." (*People* v. *Rist* (1976) 16 Cal.3d 211, 216 [127 Cal.Rptr. 457, 545 P.2d 833].)

■ A review of Maria's testimony, including her identification of defendant as her attacker, establishes her testimony as "evidence that reasonably inspires confidence and is 'of solid value.' " (*Redmond, supra,* 71 Cal.2d 745, 756.) Maria's split-second recognition of defendant as he jumped into the elevator was based upon the fact that she had encountered him twice before around the building where she lived within several weeks prior to the date of the attack—a relatively short period of time. Under this circumstance, her fleeting observation of him before he stepped behind her did not dispel the certainty of her identification. His subsequent efforts to avoid that identification, by removing her glasses and blindfolding her were to no avail, due to the initial recognition. It is true that witnesses testified that they heard Maria explain to Detective Carranza that her assailant moved so swiftly she barely had time to see him; however, these witnesses also testified that when Maria was interviewed after the rape, she stated she had seen this individual before. In addition, Maria's testimony was supported by that of Catherine, who also selected defendant's picture from a group of photographs as the person who, on a prior occasion, had approached Maria at the apartment's pool when Catherine was present.

There was nothing inherently incredible in Maria's detailed description of the sexual abuse to which she was subjected. Her testimony was largely unshaken by cross-examination. (Cf. *People* v. *Headlee* (1941) 18 Cal.2d 266 [115 P.2d 427]; *People* v. *Carvalho* (1952) 112 Cal.App.2d 482 [246 P.2d 950].) The alleged discrepancies complained of by defendant were minor in nature: a variation of 10 seconds in the time Maria observed

defendant in the elevator, and some question as to whether the pants she identified as those worn by her attacker were the pants defendant was wearing when arrested, or were merely similar but with a zipper. The jury obviously regarded Maria as a convincing witness. Her testimony provided substantial evidence to support the judgment of conviction.

## II

### Sufficiency of the Evidence to Sustain the Conviction of Kidnaping

■ Defendant contends, and we agree, that the forcible taking of Maria for some *unspecified* distance from the elevator to the storage room, and from the storage room to her apartment, was not substantial movement within the meaning of Penal Code section 207.[3] Hence, there was insufficient evidence to support defendant's conviction of the offense of kidnaping.

It is significant that the definition of the offense of kidnaping set forth in section 207 does not speak in terms of a movement of any specific or exact distance. But it is settled law that the kidnaping offense must involve a movement which is more than that which would be regarded as trivial, slight or insignificant. (See *People* v. *Daniels* (1969) 71 Cal.2d 1119 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677] (involving aggravated kidnaping, Pen. Code, § 209); *Cotton* v. *Superior Court* (1961) 56 Cal.2d 459 [15 Cal.Rptr. 65, 364 `P.2d 241] (involving Pen. Code, § 207).) We held in *People* v. *Stanworth* (1974) 11 Cal.3d 588, 601 [114 Cal.Rptr. 250, 522 P.2d 1058], that "[t]he statutory language [of section 207] implies that the determining factor in the crime of kidnaping is the actual distance of the victim's movements; and further, that the minimum movements necessary for the commission of the crime are present where the victim is forcibly taken 'into *another part* of the same county.' (Italics added.) Finally, because the victim's movements must be more than slight [citation] or 'trivial' [citation], they must be substantial in character to constitute kidnaping under section 207."

[3]Section 207 provides, in pertinent part, that "[e]very person who forcibly steals, takes or arrests any person in this state, and carries him into another country, state, or county, or into another part of the same county, . . . is guilty of kidnaping." Although section 207 employs the spelling "kidnaping" for this offense, Penal Code section 208, which fixes the punishment for the offense defined in section 207, employs the spelling, "kidnapping" for this offense. (See Stats. 1976, ch. 1139, No. 9 West's Cal. Legis. Service, p. 4785; No. 6 Deering's Adv. Legis. Service, p. 358, amending Pen. Code, § 208.)

While rejecting the imposition of a principle based upon any specific number of inches, feet, or yards as arbitrary, we concluded in *Stanworth* that movement of a quarter of a mile was substantial—not slight or trivial—and sufficient to support a conviction of kidnaping within the meaning of Penal Code section 207, requiring a forcible carrying of the victim "into another part of the same county." In *People* v. *Stender* (1975) 47 Cal.App.3d 413, 423 [121 Cal.Rptr. 334], the victim was moved 200 feet, and this was held sufficient to support the conclusion that such movement was substantial in character rather than slight or trivial.

The asportations involved in *Stanworth* and *Stender,* however, are to be compared with those found in cases such as *People* v. *Thornton* (1974) 11 Cal.3d 738 [114 Cal.Rptr. 467, 523 P.2d 267], *People* v. *Brown* (1974) 11 Cal.3d 784 [114 Cal.Rptr. 426, 523 P.2d 226], and *Cotton* v. *Superior Court* (1961) 56 Cal.2d 459 [15 Cal.Rptr. 65, 364 P.2d 241]. In *Thornton,* the defendant confronted his victim in a single-room laundromat facility, knocked her down and then dragged her to the rear of the facility where he committed various sexual acts. In holding this asportation to be slight and insubstantial, we stated: "Because the sexual assault there took place wholly within the confines of a single room in a laundromat, any asportation involved was not ' "into another part of the same county" ' within the meaning of section 207." (*Id.,* at p. 767.)

In *Brown,* the defendant confronted his victim in the kitchen of her house and took her forcibly through various rooms, returning to the kitchen and then the living room. Finally, the defendant dragged the victim out of the back door and along the side of her house for a distance estimated to be not more than 75 feet. We held this movement of the victim to be insubstantial, stating: "The asportation of the victim within her house and for a brief distance outside the house must be regarded as trivial." (*Brown, supra,* 11 Cal.3d 784, 789.)

In *Cotton,* a victim was dragged approximately 15 feet. To have deemed such an asportation as sufficient for the offense of kidnaping would have sanctioned an interpretation of Penal Code section 207 to permit the "slightest movement" to be considered as a forcible taking of a victim from one part of the county to another. Hence, we ordered that the simple kidnaping charges be set aside.

In the case at bench, the record does not provide us with exact distances; we know only that both the storeroom and Maria's apartment were located on the same floor of a multi-unit apartment building.

Nevertheless, the factual situation most nearly resembles those encountered in *Brown* (a movement of approximately 75 feet), *Thornton* (a movement within the confines of a single room), and *Cotton* (a movement within various rooms of a house and an additional 15 feet outside), than those found in *Stanworth* (a movement of a quarter of a mile), and *Stender* (a movement of 200 feet). The record in the instant case does not establish that Maria was moved a greater distance than that involved in *Brown, Cotton,* or *Thornton.*

The People seek to introduce considerations—other than actual distance—as determinative of what constitutes "sufficient movement" of the victim to constitute the offense of kidnaping pursuant to Penal Code section 207. The People claim that intimations in *Stender* suggest that, in the case before us, we should consider Maria's movement substantial because defendant moved Maria to the storage room to avoid detection, thereby increasing her danger, and then waited 20 minutes before he moved her to her apartment. In our view, this position is lacking in substance. Neither the incidental nature of the movement, the defendant's motivation to escape detection, nor the possible enhancement of danger to the victim resulting from the movement is a factor to be considered in the determination of substantiality of movement for the offense of kidnaping. Such factors would be relevant in a *Daniels* situation of aggravated kidnaping—a kidnaping for the purpose of robbery (Pen. Code, § 209)—but we held in *Stanworth* that the *Daniels* test was not applicable to simple kidnaping under Penal Code section 207.[4]

We perceive no legitimate rationale for holding as substantial the asportation involved here because it was accomplished in two stages with a delay between them. It appears that the asportations were both "trivial," and cannot constitute substantial movement because there were

---

[4]In *Daniels* (71 Cal.2d 1119), we were concerned with the construction of Penal Code section 209 that defines aggravated kidnaping such as kidnaping for the purpose of robbery. *Daniels* overturned the rule of construction declared in *People* v. *Chessman* (1951) 38 Cal.2d 166, 192 [238 P.2d 1001], that "[i]t is the fact, not the distance, of forcible removal which constitutes kidnaping in this state." *Daniels* was a holding that aggravated kidnaping under Penal Code section 209 does not exist where the movement of the victim in furtherance of robbery is merely incidental to that crime *and* does not substantially increase the risk of harm otherwise present. In *In re Earley* (1975) 14 Cal.3d 122 [120 Cal.Rptr. 881, 534 P.2d 721], we re-emphasized our holding in *Stanworth* that the *Daniels* test (the movements must not be merely incidental to the commission of the robbery *and* must substantially increase the risk of harm beyond that inherent in the crime of robbery) is inapplicable to simple kidnaping (Pen. Code, § 207) because "both prongs of the *Daniels* test refer to robbery and that simple kidnaping may occur in the absence of another crime." (*In re Earley, supra,* 14 Cal.3d 122, 128.)

two movements with various motivations accounting for the two movements. We conclude that the judgment of conviction of simple kidnaping must fall for lack of evidentiary support.

## III

*Sufficiency of the Evidence to Sustain the*
*Finding That, During the Course of the*
*Commission of the Burglary, Defendant*
*Inflicted Great Bodily Injury Upon*
*the Occupant of the Burglarized*
*Premises*

Defendant's final contention is that the evidence showing that he raped the victim twice, sodomized her and compelled her several times to orally copulate him is insufficient to support the jury's finding that he inflicted "great bodily injury" upon the victim within the meaning of Penal Code section 461, which prescribes enhanced punishment for the intentional infliction of such injury.[5]

There can be no quarrel with the fact that defendant engaged in a sexual attack upon the victim of such an outrageous, shocking and despicable nature that the victim suffered extreme humiliation and distress due to the flagrant violation of her person and her privacy. The question presented, however, is whether she sustained "great bodily

---

[5]At the date of the offenses involved herein, Penal Code section 461 provided: "Burglary is punishable as follows: [¶] 1. Burglary in the first degree: by imprisonment in the state prison for not less than five years. [¶] 2. Burglary in the second degree: by imprisonment in the county jail not exceeding one year or in the state prison for not less than one year or more than 15 years. [¶] The preceding provisions of this section notwithstanding, in any case in which defendant committed burglary and in the course of commission of the burglary, with the intent to inflict such injury, inflicted great bodily injury on any occupant of the premises burglarized, such fact shall be charged in the indictment or information and if found to be true by the jury, upon a jury trial, or if found to be true by the court, upon a court trial, or if admitted by the defendant, defendant shall suffer confinement in the state prison from 15 years to life."

The last paragraph of section 461 was added by the Legislature in 1967. (See Stats. 1967, ch. 150, § 1, p. 1216.) With the addition of this provision, the Legislature provided for three levels of punishment for the crime of burglary: 1-15 years for second degree burglary (Pen. Code, § 461, subd. 2), 5 years to life for burglary in the first degree (Pen. Code, § 461, subd. 1), and 15 years to life if the burglar intentionally inflicted great bodily injury upon an occupant.

At the same time that Penal Code section 461 was amended, similar provisions were added to Penal Code sections 213 and 264, escalating the penalty for robbery and rape, respectively, to 15 years to life when the victim of those crimes suffered great bodily injury. (Stats. 1967, ch. 149, § 1, p. 1216; Stats. 1967, ch. 151, § 1, p. 1217.)

injury" as that term is used in Penal Code section 461. Thus, the issue is solely one of statutory interpretation. We begin our analysis with a consideration of the history of the legislation involved. At the time the 1967 amendments to Penal Code sections 461, 213 and 264 became effective, the Penal Code did not define the term "great bodily injury" as it was added to sections 461 (burglary), 213 (robbery), and 264 (rape) for penalty enhancement. Nor does any applicable legislative history offer a definition to pinpoint the level of injury intended by the Legislature in using the phrase "great bodily injury."

Although the decisional law has established many rules of statutory construction, they all are basically guides in the judicial quest to determine the Legislature's intent so that the purpose of the legislation may be effectuated. Thus, we have said that "we must apply every statute in the case according to our best understanding of the legislative intent; . . ." (*People* v. *Daniels, supra,* 71 Cal.2d 1119, 1128.) In a similar vein, we have recently stated: " 'Therefore we must interpret the statute in question in accordance with applicable rules of statutory construction, fundamental among which are those which counsel that the aim of such construction should be the ascertainment of legislative intent so that the purpose of the law may be effectuated [citation]; that a statute should be construed with reference to the entire statutory system of which it forms a part in such a way that harmony may be achieved among the parts [citation]; and that courts should give effect to statutes "according to the usual, ordinary import of the language employed in framing them." [Citation.]' " (*People* ex rel. *Younger* v. *Superior Court* (1976) 16 Cal.3d 30, 40 [127 Cal.Rptr. 122, 544 P.2d 1322].) In our search for legislative intent, we are also guided by the principle that "[i]n construing a criminal statute, a defendant 'must be given the benefit of every reasonable doubt as to whether the statute was applicable to him.' [Citation.]" (*People* v. *Baker* (1968) 69 Cal.2d 44, 46 [69 Cal.Rptr. 595, 442 P.2d 675].)

It seems clear that the Legislature, by providing for an enhancement of the punishment for burglary, robbery and rape, whenever the victim suffered great bodily injury, wished to provide deterrence in the hope that violent crimes involving serious injury to the victims would be lessened. The fact that substantially identical enhancement provisions were added to the three sections of the Penal Code simultaneously underscores the legislative intent to offer protection to potential victims. But this does not tell us the level of injury the Legislature had in mind.

Defendant argues that if a forcible rape *itself* is deemed sufficient to support a finding of "great bodily injury," then such injury would occur in every case of forcible rape, and the 1967 amendment to Penal Code section 264 would be meaningless. He contends that in light of the essentially identical enhancement provisions added to the burglary, robbery and rape sections, the Legislature must have intended that evidence of bodily injury—*beyond* that necessarily inflicted by a forcible rape—must be shown in order to support the imposition of the greater punishment. The People respond by contending that the Legislature intended that *any* injury sustained by a victim of rape, robbery or burglary renders the enhancement provisions applicable.

In order that we may give effect to the statute "according to the usual, ordinary import of the language employed in framing [it]" (*Younger, supra,* 16 Cal.3d 30, 40), we now proceed to analyze the process by which the Legislature arrived at its decision to employ the term "great bodily injury" in Penal Code section 461 in providing for an enhancement of the sentence for burglary.

In 1967, when the *great-bodily-injury* enhancement provisions were added to Penal Code sections 461 (burglary), 213 (robbery), and 264 (rape), section 209 of the Penal Code provided for enhancement of punishment if the victim of an aggravated kidnaping (kidnaping for purpose of ransom or robbery) sustained "bodily harm." It must be presumed that the Legislature was aware that the term "bodily harm" had been interpreted judicially to include the fact that a victim suffered a forcible rape. (*People* v. *Brown* (1947) 29 Cal.2d 555 [176 P.2d 929]; *People* v. *Chessman* (1951) 38 Cal.2d 166, 185 [238 P.2d 1001], disapproved on other grounds in *People* v. *Daniels* (1969) 71 Cal.2d 1119, 1139 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677].) *Chessman* reached this result by relying on the interpretation of "bodily harm," set forth in *People* v. *Tanner* (1935) 3 Cal.2d 279, 297 [44 P.2d 324]: "It will be noted that the statute does not use the words actual bodily harm, or great bodily harm, or bodily injury. Bodily, used singly, is defined as pertaining to the body. It is opposed to mental 'as bodily labor or pain;['] physical is often synonymous with bodily, as physical discomfort, suffering. Harm is defined as 'hurt;' injury; damage; (2) grief, pain, sorrow;. (3) evil; wrong; wickedness.' (Webster's International Dictionary, 2d ed.) *Bodily harm* is generally defined as 'any touching of the person of another against his will with physical force in an intentional, hostile and aggravated manner, or projecting of such force against his person.' " (Italics in original.) In view of the interpretation of "bodily harm" set forth in *Tanner,* the *Brown*

and *Chessman* holdings—that a forcible rape, without more, constitutes the infliction of "bodily harm"—are a logical consequence of the *Tanner* interpretation.

The term "great bodily injury," added to Penal Code section 461, substitutes the word "injury" for the word "harm" used in section 209, and adds the adjective "great." The use of different language in section 461 from that used in section 209 implies, without question, an intent to punish a higher level of bodily injury in section 461 (burglary). The standard dictionary definition of "great" emphasizes largeness, e.g., of notable size, extreme, marked.[6] Ordinary usage suggests that the Legislature intended to refer to *substantial* injury, not necessarily a concomitant of every forcible rape. Had the Legislature intended *not* to refer to a *substantial* bodily injury, logic impels the conclusion that the Legislature in 1967 would have spelled out the language of the amendments to Penal Code sections 461, 213 and 264 in terms of "bodily harm," as then used in Penal Code section 209, thereby providing for a lesser degree of harm in light of the interpretation of section 209 set forth in *Brown* and *Chessman.*

That the Legislature intended a different meaning to be ascribed to the use of the term "great bodily injury" in Penal Code section 461 than the term "bodily harm" previously used in Penal Code section 209, is further supported by the recent legislative history of section 209. In 1976, the Legislature amended Penal Code section 209, as a part of the enactment of the Uniform Determinate Sentencing Act, effective July 1, 1977, to provide punishment of imprisonment for life without possibility of parole in the event the victim of a kidnaping for ransom suffers "bodily harm."[7] Having used the term "great bodily injury" in 1967, in amending Penal Code sections 461, 213 and 264, the Legislature, in 1976, nine years later, saw fit to amend Penal Code section 209 but *not* to change the term "bodily harm" to that of "great bodily injury."

The decisional law that has interpreted the term "great bodily injury" is somewhat in conflict. The first case construing the enhancement provision of section 461 is *People* v. *Wells* (1971) 14 Cal.App.3d 348 [92 Cal.Rptr. 191]. Noting that a burglary is escalated from the second to the first degree when it involves an assault upon an occupant of the premises, the court reasoned that the great-bodily-injury provision "was designed to

---

[6]Webster's Third New International Dictionary.

[7]Statutes 1976, chapter 1139, No. 9 West's California Legislative Service, page 4785; No. 6 Deering's Advance Legislative Service, page 358.

impose a higher punishment on the perpetrator if he inflicts injuries more serious than those incurred in a simple assault." (*Id.*, at p. 357.)[8]

The *Wells* court approved an instruction which advised the jury that great bodily injury "refers to significant or substantial bodily injury or damage; it does not refer to trivial or insignificant injury," and held that evidence that the victim had been knocked unconscious and had suffered numerous cuts, with scars still evident at time of trial, and intense headaches for several days, was sufficient to support such a finding.

In *People* v. *Richardson* (1972) 23 Cal.App.3d 403 [100 Cal.Rptr. 251], the court construed the great-bodily-injury provision of Penal Code section 213 (robbery). Reviewing the instruction approved in *Wells,* the court stated that "[i]t seems that it would be correct to exclude 'moderate harm' as well." (*Id.,* at p. 411.)[9] The People contended in *Richardson* that it would further the intent of the Legislature for the court to hold that *any* injury, such as forcible rape itself, suffered by the victim of a robbery, is sufficient to support a finding of *great* bodily injury. The argument was advanced that, as injury to the victim is *not* an element of the crime of robbery, any injury such as forcible rape is in the nature of an aggravating factor for which the Legislature intended the enhanced penalty. In rejecting this argument, the *Richardson* court made reference to the similar language of section 264 (rape) and stated: "This conclusion would eliminate the word 'great' from the statute. . . . That the Legislature intended a substantial injury . . . is shown by comparison with a similar statute relating to punishment for rape . . . which was enacted contemporaneously. . . . The increased punishment, a minimum of 15 years in state prison, is to be imposed if it is charged and found to be true that the rapist intended to inflict and did inflict great bodily injury on the victim. Since rape by force or violence necessarily includes *some* injury, it must have been intended by the Legislature that the enlarged minimum term, from 3 to 15 years, should occur when a substantial injury, in addition to that which must be present in every case of rape, must have been specifically intended and actually inflicted." (*Id.,* at pp. 411-412; italics in original.)

---

[8] The *Wells* court noted that the term "great bodily injury" was already a part of the statutory law in that Penal Code section 245, subdivision (a), provided punishment for one who commits an assault "by any means of force likely to produce *great bodily injury.*" (Italics added.)

[9] Reliance for the exclusion of *moderate* harm from *great* bodily injury is placed upon *Wells, supra,* 14 Cal.App.3d 348, 359, fn. 8 and *Froedge* v. *State* (1968) 249 Ind. 438 [233 N.E.2d 631, 636].

*People* v. *Cardenas* (1975) 48 Cal.App.3d 203 [121 Cal.Rptr. 426], also involved a question of interpretation of what constitutes "great bodily injury" under Penal Code section 213 (robbery). Although the details of the crime were not disclosed in the opinion, the finding of great bodily injury apparently was based solely on the rape of the victim of the robbery, as the defendant urged that evidence of injuries beyond those necessarily inflicted in the course of a rape must be shown in order to support the finding. The People conceded the validity of the defendant's position, but the *Cardenas* court did not agree, holding that the act of forcible rape committed in the course of a robbery is sufficient to support a jury's finding under section 213 (robbery) that the defendant inflicted great bodily injury on the victim of the robbery.

The *Cardenas* court referred with approval to the dissenting opinion of Schauer, P. J., in *People* v. *McIlvain* (1942) 55 Cal.App.2d 322, 334 [130 P.2d 131], wherein he stated the view that the outrage to the person and feelings of the female—which constitutes the essential guilt of rape should be deemed great bodily injury.[10]

*Cardenas* also cited the *Brown* and *Chessman* cases, professing, apparently, to see no distinction between the term "bodily harm" (Pen. Code, § 209) and "great bodily injury" (Pen. Code, §§ 213, 264, 461). Other recent cases adopting the *Cardenas* approach are *People* v. *Superior Court (Lozano)* (1977) 69 Cal.App.3d 57 [137 Cal.Rptr. 767], and *People* v. *Superior Court (Vasquez)* (1977) 69 Cal.App.3d 14 [137 Cal.Rptr. 762].

Recently, the Legislature addressed itself to the problem of defining what constitutes "great bodily injury." As part of the Uniform Determinate Sentencing Act of 1976, made to become effective July 1, 1977, section 12022.7 was added to the Penal Code. Section 12022.7 supplants the specific great-bodily-injury provisions of Penal Code sections 213, 264 and 461 with their great-bodily-injury enhancement provisions, and is

---

[10]The *McIlvain* case involved Penal Code sections 261 (rape) and 245 (assault by means of force likely to produce great bodily injury). The majority held that "[b]odily injury is not of the essence of the offense" (rape). (*McIlvain, supra,* 55 Cal.App.2d 322, 331.) But in *Brown,* this court, in holding that forcible rape itself constitutes "bodily harm," disapproved of "[a]ny statement to the contrary" in *McIlvain.* (*Brown, supra,* 29 Cal.2d 555, 560.) In *People* v. *Jackson* (1955) 44 Cal.2d 511 [282 P.2d 898], we indicated that we doubted if the definition of "bodily harm," found in the *Tanner* case, correctly stated the intention of the Legislature in distinguishing between kidnaping with bodily harm and cases in which there was no injury to the victim. We thus cast doubt on the *Tanner* concept that, under Penal Code section 209, "any touching of the person of another against his will with physical force in an intentional, hostile and aggravated manner," with no injury to the victim, constituted "bodily harm." (*Id.,* at p. 516.)

made applicable to all felonies which do not necessarily involve such injury. Under the statutory scheme of section 12022.7, as originally enacted in 1976, the level of injury necessary to trigger the additional penalty of three years in prison was spelled out in some detail: "As used in this section, 'great bodily injury' means a serious impairment of physical condition, which includes any of the following: [¶] (a) Prolonged loss of consciousness. [¶] (b) Severe concussion. [¶] (c) Protracted loss of any bodily member or organ. [¶] (d) Protracted impairment of function of any bodily member or organ or bone. [¶] (e) A wound or wounds requiring extensive suturing. [¶] (f) Serious disfigurement. [¶] (g) Severe physical pain inflicted by torture." (Pen. Code, § 12022.7, as added by Stats. 1976, ch. 1139, No. 9 West's Cal. Legis. Service, pp. 4836-4837; No. 6 Deering's Adv. Legis. Service, pp. 452-453.)

Penal Code section 12022.7 was amended in 1977 to strike out the detailed definition of "great bodily injury" and substitute the following definition: "As used in this section, great bodily injury means a *significant* or *substantial* physical injury."[11] (Italics added.)

Thus it may be seen that the Legislature, while changing its mind with respect to a detailed definition of "great bodily injury" before that definition became effective, has now adopted a definition of "great bodily injury" that requires that the injury constitute a "significant or substantial *physical* injury," the definition approved in *Wells* and *Richardson*. This definition of great bodily injury uses the exact language found in CALJIC Instruction No. 17.20 (1973 Revision), which was given to the jury in the instant case. In the CALJIC authors' Comment to Instruction No. 17.20, reference is made to *Wells* and *Richardson* as authority to support the instruction.[12] It is apparent, therefore, that the 1977 amendment to Penal

---

[11]Statutes 1977, chapter 165, No. 5 West's California Legislative Service, page 467; No. 1 Deering's Advance Legislative Service, page 661.

[12]See California Jury Instructions, Criminal, 1976, Pocket Part for Third Revised Edition, Comment to CALJIC No. 17.20 (1973 Revision). CALJIC Instruction No. 17.20 (1973 Revision), as given to the jury, was as follows: "It is charged that in the commission of the burglary described the defendant intentionally inflicted great bodily injury on an occupant of the premises burglarized. [¶] The term 'great bodily injury,' as used in this instruction, refers to significant or substantial bodily injury or damage; it does not refer to trivial or insignificant injury or moderate harm. [¶] If you find the defendant guilty of the crime of burglary, it then will be your duty to determine whether or not the defendant, with a specific intent to inflict such injury, did inflict great bodily harm, as herein defined, on an occupant of the premises burglarized. [¶] He may be found to have intentionally inflicted great bodily injury on such person only if the proof shows beyond a reasonable doubt that he so inflicted such injury upon such person. [¶] You will include a finding on that question in your verdict, using a form that will be supplied for that purpose."

Code section 12022.7 was not intended to lessen the magnitude of bodily injury required by the 1976 detailed definition of great bodily injury. Rather, it appears that the 1977 amendment to Penal Code section 12022.7 was designed to preclude the possibility that the 1976 detailed definition of great bodily injury be construed as all inclusive, leaving no latitude to the trier of fact to find a bodily injury of equal magnitude to the categories specified in the detailed definition but not coming literally within any category set forth therein.

We deem it significant that Penal Code section 12022.7, as amended in 1977, speaks of *physical* injury. It is contended here by the People and amici that rape, in and of itself, is such a serious invasion of individual privacy as to constitute substantial injury, as the act causes extreme humiliation to the victim and, in addition, some of the possible results of rape, i.e., pregnancy or venereal disease, can easily be equated with a high level of injury. We agree that rape or other sexually abusive conduct constitutes a serious crime, and that substantial *psychological* and *emotional* distress is experienced by rape victims generally. But we are aware of no principle of statutory interpretation that would permit the legislative language—great *bodily* injury—to be construed as including a rape victim's psychological and emotional trauma. To so construe the language of Penal Code section 461 would constitute an emasculation of the statute, contrary to the admonition that, in construing a statute, "it is our duty to . . . achieve a 'sensible construction.' [Citation.] '[T]he statute is to be given effect in its commonsense meaning.' " (*Stanworth, supra,* 11 Cal.3d 588, 601.)[13]

That the Legislature did *not* intend to equate the concept of "great bodily injury" with the commission, in and of itself, of the crime of rape, is further supported by a consideration of the language used by the Legislature in defining, not only the crime of rape, but the crimes of sodomy and oral copulation as well. In defining rape, two categories set forth in Penal Code section 261 (as amended in 1970)[14] are significant. One category is where the victim resists, "but her resistance is overcome by force or violence." (Subd. 2.) A second category is where the victim is prevented from resisting "by threats of great and immediate bodily

---

[13]It is to be noted that Penal Code section 263 provides: "The essential guilt of rape consists in the outrage to the person and feelings of the female. Any sexual penetration, however slight, is sufficient to complete the crime." The Legislature has not seen fit to change section 263 since its original enactment in 1872.

[14]See Statutes 1970, chapter 1301, section 1, page 2405. There has been no further amendment of Penal Code section 261.

harm." (Subd. 3.) It seems obvious that by defining rape in categories in which one category is accomplished by the use of force or violence, and a second category is accomplished by the use of "threats of great and immediate bodily harm," the Legislature indicated an intent that rape by force or violence was *not* synonymous with rape by means of great and immediate bodily harm. Otherwise, Penal Code section 261 would have included an act of rape through the use of "great and immediate bodily harm" to the victim in the same category (subd. 2) as rape committed through the use of "force" or "violence." That great and immediate bodily harm was intended to be something more than, and different from, the use of force or violence is also evidenced by the fact that Penal Code section 261 did not use the alternative language in subdivision 2 of an act of rape accomplished through the *threat* of force or violence, along with a *threat* of great and immediate bodily harm.

Subdivision (a) of Penal Code section 286 (as amended by Stats. 1975, ch. 71, § 7, p. 133; Stats. 1975, ch. 877, § 1, p. 1957) provides: "Sodomy is sexual conduct consisting of contact between the penis of one person and the anus of another person." Subdivision (c) provides: "[a]ny person . . . who has compelled the participation of another person in an act of sodomy by force, violence, duress, menace, *or threat of great bodily harm,* shall be punished by imprisonment in the state prison for a period of not less than three years." (Italics added.) Effective July 1, 1977, section 286, subdivision (a),[15] was made to read the same as provided by the 1975 amendment, and subdivision (c) of section 286 was made to read the same as subdivision (c) read by virtue of the 1975 amendment, except that the punishment provision is stated to be imprisonment in the state prison for "two, three or four years."[16] It can thus be seen that, in a fashion similar to the rape statute (Pen. Code, § 261), the Legislature, in the sodomy statute (Pen. Code, § 286),[17] has defined sodomy when it is accomplished by (1) force, (2) violence, (3) duress, (4) menace, or (5) threat of great bodily harm. The Legislature must have intended "great bodily harm" to constitute something more than, and different from, "force" or "violence," since the statute did *not* set forth the alternative means of an act of sodomy accomplished by *threat* of force or violence, along with an act of sodomy accomplished by *threat* of great bodily harm.

---

[15]Statutes 1976, chapter 1139, No. 9 West's California Legislative Service, page 4794; No. 6 Deering's Advance Legislative Service, page 375.

[16]Statutes 1976, chapter 1139, No. 9 West's California Legislative Service, page 4794; No. 6 Deering's Advance Legislative Service, page 375.

[17]Statutes 1976, chapter 1139, No. 9 West's California Legislative Service, page 4794; No. 6 Deering's Advance Legislative Service, page 375.

In defining the offense of oral copulation (Pen. Code, § 288a), the Legislature used terminology similar to that used in the sodomy statute (Pen. Code, § 286) for purposes of making the degree of punishment depend upon factors of seriousness of the methods used in the commission of the crime itself. Thus, Penal Code section 288a (as amended by Stats. 1975, ch. 71, § 10, p. 134; Stats. 1975, ch. 877, § 2, p. 1958) defines oral copulation as follows in subdivision (a): "Oral copulation is the act of copulating the mouth of one person with the sexual organ of another person." In subdivision (c), it is provided: "Any person who . . . has compelled the participation of another person in an act of oral copulation by force, violence, duress, menace, or *threat of great bodily harm,* shall be punished by imprisonment in the state prison for a period not less than three years." (Italics added.)

The 1976 version of subdivision (a) of Penal Code section 288a[18] defines the offense of oral copulation exactly the same as such offense was defined in subdivision (a), as amended by the 1975 legislation. The 1976 version of subdivision (c) of Penal Code section 288a[19] uses the same language that subdivision (c) contained by virtue of the 1975 legislation, with the exception of a change in the punishment provided for the offense. Here, again, the statutory language for the crime of oral copulation is the same as it is for the crime of sodomy in distinguishing between the use of force and violence to accomplish the offense and the use of threats to accomplish the offense—the threats required being those of great bodily harm. The conclusion is compelled that the oral copulation statute, by not including the feature of the accomplishment of the crime by use of great bodily harm, along with the use of force, violence, duress or menace, and by not including the feature of the accomplishment of the crime by *threats* of force or violence, along with *threats* of great bodily harm, indicates clearly a legislative recognition and intent that accomplishment of the offense of oral copulation by the *actual use* of force, violence, duress, or menace does not necessarily mean that the offense is being committed also by the infliction upon the victim of great bodily injury.

The construction indicated for Penal Code sections 261 (rape), 286 (sodomy), and (288a) (oral copulation) appears to us to be mandated by the principle of statutory construction " 'that a statute should be construed

---

[18]Statutes 1976, chapter 1139, No. 9 West's California Legislative Service, page 4795; No. 6 Deering's Advance Legislative Service, page 376.

[19]Statutes 1976, chapter 1139, No. 9 West's California Legislative Service, page 4795; No. 6 Deering's Advance Legislative Service, page 376.

with reference to the entire statutory system of which it forms a part in such a way that harmony may be achieved among the parts [citation].' " (*Younger, supra,* 16 Cal.3d 30, 40.)

It is apparent to us, therefore, that in the context of Penal Code section 264 (rape), the Legislature intended the term great bodily injury to refer to substantial or significant injury "in addition to that which must be present in every case of rape." (*Richardson, supra,* 23 Cal.App.3d 403, 412.) It is significant that the 1967 amendment to Penal Code section 264 did not increase the penalty for the crime of forcible rape itself. Rather, with the apparent purpose of deterring, by punishing more severely, particularly brutal or injurious rapes, the provision added in 1967 enlarged the minimum term by 12 years when, in addition to committing the act of forcible rape, the rapist intentionally inflicts great bodily injury on his victim.

It follows that in using the same language in simultaneously amending Penal Code sections 213 (robbery) and 461 (burglary), the Legislature intended to require a similar showing of substantial or significant bodily injury if the 10-year increase in the minimum term provided by those sections is to be imposed. It is an established rule of statutory construction that similar statutes should be construed in light of one another (*City of National City v. Fritz* (1949) 33 Cal.2d 635, 637 [204 P.2d 7]; *Frediani v. Ota* (1963) 215 Cal.App.2d 127, 133 [29 Cal.Rptr. 912]), and that when statutes are *in pari materia* similar phrases appearing in each should be given like meanings. (*In re Phyle* (1947) 30 Cal.2d 838, 845 [186 P.2d 134]; *In re Marriage of Pinto* (1972) 28 Cal.App.3d 86, 89 [104 Cal.Rptr. 371]; 59 Ops. Cal. Atty. Gen. 23, 25 (1976).) The great-bodily-injury provisions employ the identical language and have the "same purpose or object" of deterring the infliction of serious injury upon the victims of crime; they are obviously *in pari materia.* (See 2A Sutherland, Statutory Construction (Sands rev. ed. 1973) Interpretation by Reference to Related Statutes, § 51.03, p. 298.) Furthermore, the provisions were enacted contemporaneously. ". . . ▓ [A]pplication of the rule that statutes in pari materia should be construed together is most justified, and light from that source has the greatest probative force, in the case of statutes relating to the same subject matter that were passed at the same session of the legislature, especially if they were passed or approved or take effect on the same day, . . ." (*Id.,* at p. 299.) (Fns. omitted.)

Nevertheless, the People make the same contention before us that was made in *Richardson*—that even if forcible rape itself is insufficient to

constitute a finding of great bodily injury under the enhancement provision of the rape statute (Pen. Code, § 264), it should be held to constitute great bodily injury for robbery (Pen. Code, § 213) and burglary (Pen. Code, § 461) because it is not an element of either offense. But this contention lacks support in any sound principle of statutory construction. If the Legislature had intended in Penal Code sections 213 (robbery) and 461 (burglary) to refer to a level of injury different from that required under section 264 (rape), and one which would include the crime of rape itself, we believe the Legislature would have chosen language such as is found in Penal Code section 209 (aggravated kidnaping), which would have clearly articulated such an intent. Since we have held that a rape itself may constitute "bodily harm" for the purpose of aggravated kidnaping (*Chessman, supra,* 38 Cal.2d 166, 185; *Brown, supra,* 29 Cal.2d 555, 560), we may assume that the Legislature was aware that we had construed the term in this manner. (See *Stafford* v. *Realty Bond Service Corp.* (1952) 39 Cal.2d 797, 805 [249 P.2d 241]; *Sutter Hospital* v. *City of Sacramento* (1952) 39 Cal.2d 33, 38 [244 P.2d 390]; *Kadota* v. *City & County of S. F.* (1958) 166 Cal.App.2d 194, 195 [333 P.2d 75].) But instead of providing additional punishment when the victim of a robbery or a burglary suffers *bodily harm* in contradistinction to the "great bodily injury" required under Penal Code section 264, the Legislature selected the same standard as that set forth in the rape statute. The failure of the Legislature to employ an available, previously construed term which would have accomplished with precision the very result the People urge the Legislature intended, demonstrates the fundamental weakness in the People's position.[20]

Moreover, even if the diametrically opposed interpretations urged upon us by defendant and the People are equally persuasive, "[w]hen language which is reasonably susceptible of two constructions is used in a penal law ordinarily that construction which is more favorable to the offender will be adopted. . . . 'the defendant is entitled to the benefit of

---

[20]The People also rely upon the following statement made by Justice Schauer in his dissent in *McIlvain, supra,* 55 Cal.App.2d 322, 334, which was quoted in the opinion in *Cardenas, supra.* Dissenting from the majority's holding that one could be convicted of both forcible rape and assault by means likely to produce great bodily injury (Pen. Code, § 245, subd. (a)) based upon the same act, Justice Schauer stated, inter alia: "Surely pregnancy as a result of forcible rape is great bodily injury. So also is the 'outrage to the person and feelings of the female' which constitutes the essential guilt of rape." Justice Schauer was not interpreting the term great bodily injury in the particular context in which the Legislature has used it in the provisions before us, however. Although we do not take issue with the validity of his observations as a general matter, his words do not provide evidence that the Legislature intended the term great bodily injury to have a different meaning in Penal Code sections 213 and 461 than it has in section 264.

every reasonable doubt, whether it arise out of a question of fact, or as to the true interpretation of words or the construction of language used in a statute.' [Citations.]" (*People* v. *Ralph* (1944) 24 Cal.2d 575, 581 [150 P.2d 401].) ■ Guided by applicable rules of statutory construction, and favoring a consistent interpretation of like terms, we must conclude that in enacting the great-bodily-injury provisions of Penal Code sections 213, 264 and 461, the Legislature intended to refer to injuries of a similar nature and magnitude. In order to sustain a finding of great bodily injury under these sections there must be evidence of injury substantially *beyond* that necessarily present in the commission of rape. To the extent that *People* v. *Cardenas* (1975) 48 Cal.App.3d 203 [121 Cal.Rptr. 426]; *People* v. *Superior Court (Lozano)* (1977) 69 Cal.App.3d 57 [137 Cal.Rptr. 767]; and *People* v. *Superior Court (Vasquez)* (1977) 69 Cal.App.3d 14 [137 Cal.Rptr. 762], have held differently, they are disapproved.

■ It follows from our holding that forcible rape cannot, in and of itself, constitute great bodily injury for the enhancement-of-punishment provision of burglary (Pen. Code, § 461), that neither can sodomy (Pen. Code, § 286), in and of itself, nor oral copulation (Pen. Code, § 288a), in and of itself, constitute great bodily injury under the burglary statute (Pen. Code, § 461).

We consider next the question of whether the defendant's commission of sodomy and oral copulation upon the victim in addition to rape constitutes great bodily injury for purposes of enhanced punishment under the burglary statute. We conclude that it does not. Since neither offense—rape, sodomy or oral copulation—by itself, constitutes a *substantial* or *significant bodily* injury to the victim, but only the lesser injury of "bodily harm" (*Brown, supra,* 29 Cal.2d 555, *Chessman, supra,* 38 Cal.2d 166; and *Tanner, supra,* 3 Cal.2d 279), we can find no logic in the theory that these offenses, added together, change from the lower level of "bodily harm" injury to the more serious consequence of *substantial* or *significant* physical injury to constitute "great bodily injury." The physical effect upon the victim of rape remains essentially unchanged by the additional sexual offenses—considered in the light of the acts necessary to constitute the commission of such offenses. Hence, the pyramiding of the sexual offenses of sodomy and oral copulation upon rape, without more, is insufficient to invoke the enhancement provision of Penal Code section 461—the burglary statute—in the absence of legislative direction to this effect.

On the third day of its deliberations in the case at bench, the jury sent a communication to the court asking "[c]an rape, sodomy, oral copulation be determined as inflicting great bodily injury?" The court responded: "The answer to the question, ladies and gentlemen, is yes, that's a fact issue for you to determine. You have previously been given an instruction which defines great bodily injury. You are to take that instruction, apply it to the facts of the case and make your own determination as to whether it does or does not constitute great bodily injury." The trial court's response was error, as it authorized the jury to find that the victim, Maria, had suffered great bodily injury from the fact alone that she had been the victim of rape, sodomy and oral copulation, without any additional physical manifestations or consequences.

■ The People contend, however, that the evidence in the case at bench establishes that the victim suffered significant physical injury beyond the "bodily harm" inherent in the acts themselves of rape, sodomy and oral copulation. The physical effects to Maria, the victim—beyond the bodily invasions resulting from the acts of rape, sodomy and oral copulation—consisted of her gagging, spitting and vomiting from the oral copulations, and bowel evacuations from the sodomy. Dr. Marshall, who examined the victim at the hospital in the late afternoon of the same day on which the offenses were committed, found that she had incurred a superficial three-inch laceration at the front of her neck and a superficial one and one-half inch laceration on the back of her neck. Neither laceration required suturing. Dr. Marshall did not find any cuts on Maria's two fingers as testified to by her. He further testified that there was no apparent injury, laceration or hematoma to the sexual organs or to the anus. The victim did not testify that she suffered any pain resulting from the acts of rape, sodomy or oral copulation.

Whether the evidence of bodily injury in a specific case establishes injury of a significant or substantial nature, as contrasted with an injury that is trivial, insignificant or moderate, is normally a question of fact for jury determination. But the bodily injuries sustained by the victim in the instant case during the course of the combined sexual outrages perpetrated by defendant can at most be considered to be insubstantial in nature—certainly not of the magnitude to be termed significant or substantial. They were injuries that can logically only be described as constituting transitory and short-lived bodily distress. They do not fall within the contours of injuries that are severe or protracted in nature. The two neck cuts were superficial, with no indication of any permanent, protracted or visible disfigurement. The transitory and short-lived mani-

festations of physical or bodily effects suffered by the victim did not result in any serious impairment of physical condition or any protracted impairment of function of any portion of her body. Hence, they do not fall within the meaning of "great bodily injury" envisioned by the Legislature in its 1967 amendment to Penal Code section 461, and continued in its 1976 enactment of and in its 1977 amendment to Penal Code section 12022.7 to define "great bodily injury" as meaning "a significant or substantial physical injury."

The judgment is reversed as to the conviction of kidnaping (count I). The judgment is modified to strike the finding that defendant inflicted great bodily injury upon Maria, as charged in count VI. In all other respects, the judgment is affirmed.

Bird, C. J., Tobriner, J., Mosk, J., and Manuel, J., concurred.

**BIRD, C. J.,** Concurring.—I have given this case considerable thought, and I find I am compelled to sign the opinion of the majority since the legislative history of Penal Code section 461 indicates that the Legislature intended that rape per se could not be deemed "great bodily injury." This court must give full weight to that intent, whatever our personal views concerning this most serious offense.

The offenses committed by appellant on the victim in this case were "outrageous, shocking and despicable," as the majority state. (Maj. opn., *ante,* at p. 575.) It has been noted that "[i]n the crime of rape, the victim is not only deprived of autonomy and control, experiencing manipulation and often injury to the envelope of the self, but also intrusion of inner space, the most sacred and most private repository of the self. It does not matter which bodily orifice is breached. Symbolically they are much the same and have, so far as the victim is concerned, the asexual significance that forceful access has been provided into the innermost source of ego." (Bard & Ellison, *Crisis Intervention and Investigation of Forcible Rape,* The Police Chief (May 1974) at pp. 68, 71.)

However, personal repugnance toward these crimes cannot be a legitimate basis for rewriting the statute as it was adopted by the Legislature. It is precisely because emotions are so easily called into play in such situations that extra precaution must be taken so that this court follows the legislative intent and not our own predelictions or beliefs. This court has no choice in this matter. It must accept the Legislature's

intent despite any personal feelings to the contrary. This court must accord the words of statutes their plain meaning and has done so in this case. However, the Legislature is the proper governmental body to consider whether rape per se is a basis for the enhancement of punishment and to so provide if they deem it appropriate.

**RICHARDSON, J.,** Concurring and Dissenting.—I concur in parts I and II of the majority opinion, and in the reversal of the judgment as to the kidnaping count. I respectfully dissent, however, from part III of the opinion, and from the modification of the judgment which strikes the finding that defendant inflicted great bodily injury upon his victim during commission of a burglary. In my view, the evidence amply supports a finding of great bodily injury.

As the majority explains, section 461 of the Penal Code (all statutory references are to that code) prescribes enhanced punishment for the intentional infliction of "great bodily injury" upon any occupant of the premises burglarized. (Similar enhancement is prescribed for great bodily injury in the course of rape (§ 264) or robbery (§ 213).) Undoubtedly, as the majority suggests, the foregoing sections were enacted to deter instances of severe violence accompanying a burglary, rape or robbery.

The majority further properly construes section 461 as requiring that a "substantial or significant" bodily injury occur in order to impose enhanced punishment. In addition, by reason of the enactment of section 264, the majority assumes that the term "great bodily injury" refers to more than the psychological or emotional distress experienced by rape victims generally. This latter point is troublesome, however. It is certainly arguable that rape per se, without any aggravating circumstances whatever, involves a "substantial and significant" bodily injury. (See *People* v. *Cardenas* (1975) 48 Cal.App.3d 203, 207 [121 Cal.Rptr. 426]; *People* v. *McIlvain* (1942) 55 Cal.App.2d 322, 334 [130 P.2d 131], dis. opn. by Schauer, J.) But even assuming that something more "substantial" than rape is required to constitute great bodily injury, surely that test is satisfied in the present case.

I need not describe in detail the various acts and offenses committed by defendant who, over a two-hour period, forcibly copulated the victim's vagina, mouth and anus. The victim was pushed, shoved, cut twice by a knife, raped, sodomized and abused to the point of vomiting, diarrhea and hysteria. Her neck wounds were, respectively, three inches and one

and one-half inches long. Under no reasonable view of the evidence could the victim's injuries in this case be deemed either "trivial or insignificant." (See *People* v. *Wells* (1971) 14 Cal.App.3d 348, 360 [92 Cal.Rptr. 191]; *People* v. *Richardson* (1972) 23 Cal.App.3d 403, 411 [100 Cal.Rptr. 251].)

I would affirm the judgment as to the first degree burglary count.

Clark, J., concurred.