[No. A075476. First Dist., Div. Five. Dec. 2, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
KEITH S. HITCHINGS, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to rules 976 and 976.1, California Rules of Court, this opinion is certified for publication with the exception of parts II., III., and IV.

916

---

## COUNSEL

Landra E. Rosenthal, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, David H. Rose and Ronald E. Niver, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**JONES, J.**—Keith S. Hitchings appeals his convictions on two counts of second degree murder for the killing of James and Rebecca Jensen. He primarily challenges two evidentiary rulings by the trial court, but also raises issues involving double jeopardy concerns and the adequacy of the trial court's jury instruction on the definition of "reasonable doubt." We conclude that appellant's contentions all lack merit, and therefore affirm the trial court's judgment.

### PROCEDURAL BACKGROUND

On August 4, 1982, the District Attorney for Humboldt County filed an information charging appellant in count 1 with the murder of James Jensen and in count 2 with the murder of Rebecca Jensen (Pen. Code, § 187).[1] With respect to both counts, the district attorney alleged the special circumstances that appellant had committed another murder (§ 190.2, subd. (a)(3)) and that appellant had committed the murder during the commission of a rape (former § 190.2, subd. (a)(17)(iii);[2] § 261). On March 18, 1983, a jury found appellant guilty of second degree murder as to count 1 and first degree murder as to count 2. The jury found to be true the multiple-murder special-circumstance allegation, but found not true the special circumstance that appellant had committed the murders during the commission of a rape. On May 6, 1983, the trial court sentenced appellant to the death penalty for the murder of Rebecca Jensen, and to a consecutive term of 15 years to life for the murder of James Jensen.

Appellant thereafter filed a petition for writ of habeas corpus, contending his conviction was tainted by juror misconduct. On November 4, 1993, the California Supreme Court granted appellant's petition and vacated his convictions. (*In re Hitchings* (1993) 6 Cal.4th 97 [24 Cal.Rptr.2d 74, 860 P.2d 466].) In light of its decision to grant appellant's habeas petition, the Supreme Court dismissed appellant's direct appeal as moot.

On January 11, 1994, retrial proceedings began. Prior to trial, the district attorney served notice that respondent would not seek the death penalty, but

---

[1] All further statutory references are to the Penal Code except where otherwise indicated.

[2] This provision is now codified at section 190.2, subdivision (a)(17)(C).

that the multiple-murder special circumstance would remain as part of the charges. In addition, during motions *in limine*, the district attorney advised defense counsel that respondent would be proceeding on a first degree felony murder theory with respect to Rebecca Jensen. The rape-murder special-circumstance allegation, however, which was found not true at appellant's first trial, was stricken from the charges against appellant for purposes of retrial.

Jury trial began on March 19, 1996. On May 3, 1996, the jury found appellant guilty on two counts of second degree murder, but found the multiple-murder special circumstance not true. The trial court sentenced appellant to two consecutive terms of fifteen years to life in state prison.

FACTUAL BACKGROUND

On June 14, 1982, James and Rebecca Jensen, both in their 80's, were found dead in their home in Loleta, a small community near Eureka, California. The front door to their home was locked, but the windows on either side of the door were broken out. Rebecca Jensen's body lay on the floor just inside the door. James Jensen's body was off to the left behind an overturned chair.

An autopsy revealed that James Jensen had died from intrapontine and intracranial hemorrhaging caused by a basal skull fracture. There were several severe lacerations on his head, with extensive bruising and bleeding beneath the scalp. There were also bruises on his neck and shoulders, lacerations on his forearms, and exposed bone at his wrists. The injuries were produced by an instrument with a rounded surface, such as a pipe or a baseball bat. One or more blows had fractured his skull from one side to the other on a plane behind his eyes and in front of his ears. The injuries to Jensen's arms were consistent with attempts at self-protection.

Rebecca Jensen had suffered intracranial hemorrhaging caused by blows to her head. Her skull had been fractured on the left side past the midline to the right side of the sella. Her scalp and eyebrows were also lacerated. Her right ear was injured. She had contusions and bruises on her shoulders, a fractured and lacerated elbow, and various abrasions on her arms. The latter injuries were probably defensive wounds. Mrs. Jensen's injuries were caused by the same type of instrument that caused Mr. Jensen's injuries.

A number of footprints were found at the scene, both inside and outside the house. The prints found in the home and on the Jensens' front door matched the soles of a pair of boots seized from appellant shortly after the

murders, and a criminalist testified that the prints were definitely made by the boots. The criminalist also determined through DNA tests that traces of blood on appellant's right boot could have come from either of the Jensens, but not from appellant. The police also recovered a knife and sheath that were later identified as belonging to appellant, and several pieces of a broken bat. Blood found on the bat was of a type consistent with Rebecca Jensen's blood.

Appellant and his girlfriend, Shannon Pellegrini, had driven from Eureka to Ruth Lake to attend a rodeo on June 12. He drank heavily, and left on foot that evening after arguing with his girlfriend about his drinking. He met up with several other men early the next morning and drank heavily throughout the day of June 13. Late that afternoon, the man with whom appellant was riding left appellant in Loleta, because the driver did not want to take appellant all the way back to Eureka.

A number of the Jensens' neighbors testified at trial that a man had been knocking on doors and asking residents for a place to sleep on the evening of June 13, the night before the Jensens' bodies were discovered. These witnesses identified appellant as the man they saw that evening.

One of the neighbors testified that he had called the sheriff that night. The sheriff found appellant walking along a road about 200 yards away from the Jensens' house. At the sheriff's request, appellant produced his driver's license identifying him as Keith Sanford Hitchings. He told the sheriff he was walking because his girlfriend had his car. The sheriff noticed that appellant's right pants leg was torn, and that there were scratches on appellant's arms and an open blister on his right thumb. There were also blood smears on appellant's arms, and there appeared to be blood on appellant's work boots. Appellant told the sheriff he had a knife in a sheath on his belt, but the sheriff could not locate it.

Appellant was arrested and booked at the county jail at 11 p.m. the evening of June 13, 1982, for public drunkenness. He was released early on the morning of June 14. He was arrested the next day after the Jensens' bodies were discovered.

DISCUSSION

I. *The Trial Court Did Not Err by Denying Appellant's Request to Play the Audiotape of His Conversation With Shannon Pellegrini for the Jury in Its Entirety*

Shortly after his arrest, but before he had been charged with any crime, appellant met with his girlfriend, Shannon Pellegrini, at the county

jail. During this conversation, appellant told Pellegrini he could not remember what had happened. Their conversation was monitored and recorded by the sheriff's department.

At his first trial, appellant had testified that he did not remember entering the Jensens' house, and that he did not believe he killed them. This testimony was read into the record by the district attorney at the second trial. According to appellant, the district attorney was using appellant's prior testimony to suggest he was lying about his lack of memory.

Thus, at the close of the prosecution's case, defense counsel requested permission to play the entire tape of appellant's conversation with Pellegrini for the jury to demonstrate that he had professed a lack of memory to Pellegrini prior to being charged. Over the district attorney's objection, the trial court permitted defense counsel to read only limited portions of a transcript of the recording into the record. We quote those portions here: "Page four, 'Keith. Yeah. Well, I wish—just wish I wouldn't have got drunk so I would know where I was at through all this thing, you know. [¶] Shannon. Yeah. [¶] Keith. Because the last I remember I was in Fortuna going into a bar. The next thing I know I remember cutting myself. I remember asking the guy, can I stay at his house. Then the next thing I know I got put in the car and that is all I can remember.' [¶] Page seven, 'Keith, I don't remember leaving Fortuna. That is all I can remember. I remember— the last I remember I was in a bar in Fortuna then the next thing I know I was asking that guy could I stay at his house, and the next thing I was getting thrown in jail, getting in the car.' [¶] Page thirteen, 'Keith, yeah. I don't know. I am just scared because I can't remember. I can't remember, you know.' [¶] Shannon. Uh-huh. [¶] Keith. Boy, when I get out of this some day, boy, there is no more drinking for me.' [¶] Page seventeen. 'Keith. I just wish I wouldn't have gotten drunk so I could remember all this. [¶] Shannon. Yeah. [¶] Keith. It is not going to be too good for me not remembering now I don't think.' "

Appellant contends the trial court erred by not allowing him to play the entire audiotape of his conversation with Pellegrini at the county jail. He claims this was error because the jury could not hear the tone of his voice on the tape and thus could not accurately judge the credibility of his statements. Appellant contends the tape was admissible as a prior consistent statement under Evidence Code sections 791 and 1236. We disagree.

Evidence Code section 1236 provides: "Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the

statement is consistent with his testimony at the hearing and is offered in compliance with Section 791." Evidence Code section 791 provides: "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after: [¶] (a) Evidence of a statement made by him that is inconsistent with any part of his testimony at the hearing has been admitted for the purpose of attacking his credibility, and the statement was made before the alleged inconsistent statement; or [¶] (b) An express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."

Evidence Code sections 791 and 1236 are inapplicable in this case for two reasons. First, neither of the conditions set forth in the plain language of section 791 has been met. Although the district attorney argued to the jury that appellant could have been lying about his lack of memory, nothing in the record shows the district attorney attacked appellant's credibility through evidence of an inconsistent statement made by appellant after his conversation with Pellegrini. (Evid. Code, § 791, subd. (a); see *Dincau* v. *Tamayose* (1982) 131 Cal.App.3d 780, 797 [182 Cal.Rptr. 855].) In addition, appellant's conversation with Pellegrini took place *after* his arrest for murdering the Jensens. We agree with respondent that the arrest provided a motive for bias or fabrication. Thus, Evidence Code section 791, subdivision (b) is also inapplicable.

Second, as respondent argues, the tape is not admissible as a prior consistent statement under Evidence Code sections 791 and 1236 because appellant never testified at the second trial. In *People* v. *Williams* (1976) 16 Cal.3d 663 [128 Cal.Rptr. 888, 547 P.2d 1000] (*Williams*), a witness told a police officer that the defendant had committed a robbery. At the preliminary hearing, the witness denied making such a statement. The police officer then testified as to the witness's prior statement. At trial, the witness was declared unavailable, so his preliminary hearing testimony was read into the record. The district attorney again called the police officer to testify as to the witness's prior inconsistent statement under Evidence Code section 1235. The California Supreme Court held that the trial court erred by admitting the police officer's testimony because the witness had not testified at trial. In pertinent part, the court stated: "Another indication that section 1235 is inapplicable here is found in section 145 of the Evidence Code. Again, section 1235 provides: 'Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony *at the hearing* . . . .' (Italics added.) Section 145 provides:

' "The hearing" means the hearing at which a question under this code arises, and not some earlier or later hearing.' Morris not having testified at trial—the hearing at which the admissibility of his prior inconsistent statements arose—those statements were not inconsistent with his testimony 'at the hearing.' [Citation.] Therefore, Smith's testimony regarding Morris' prior inconsistent statements was not admissible under section 1235. [Citations.]" (*Williams, supra,* 16 Cal.3d at p. 669; see also *People* v. *Rojas* (1975) 15 Cal.3d 540, 548 [125 Cal.Rptr. 357, 542 P.2d 229, 92 A.L.R.3d 1127].)

Although *Williams* involved Evidence Code section 1235 and not section 1236, we find the Supreme Court's reasoning in that case persuasive. ■ The language of Evidence Code section 1236 is virtually identical to section 1235. In fact, the provisions were enacted as part of the same legislative bill in 1965, and both became effective on January 1, 1967. Thus, under ordinary rules of statutory construction, Evidence Code section 1236 should be interpreted consistently with section 1235. (*People* v. *Caudillo* (1978) 21 Cal.3d 562, 585 [146 Cal.Rptr. 859, 580 P.2d 274], disapproved on other grounds in *People* v. *Escobar* (1992) 3 Cal.4th 740, 751, fn. 5 [12 Cal.Rptr.2d 586, 837 P.2d 1100]; 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Introduction to Crimes, § 36, pp. 44-47.)

■ Here, appellant did not testify at his second trial. Thus, he did not testify at "the hearing" at which the question of whether his prior consistent statements were admissible arose. (See *Williams, supra,* 16 Cal.3d at p. 669.) Accordingly, the statements made by appellant during his conversation with Pellegrini could not be consistent with his testimony at "the hearing." Those statements are therefore not admissible under Evidence Code sections 791 and 1236. (See *Williams, supra,* 16 Cal.3d at p. 669.)[3]

II.-IV.*

. . . . . . . . . . . . . . . . . . . . . . .

---

[3]We note that appellant argues he should be treated as if he testified at the second trial because his testimony from the first trial was read into the record, and the trial court instructed the jury to treat his prior testimony as if it had been given at the second trial. He cites no authority for this proposition. Moreover, based on the circumstances present in *Williams,* we do not believe that the fact that appellant's prior testimony was read into the record affects our conclusion.

*See footnote, *ante,* page 915.

## Disposition

The judgment is affirmed.

Peterson, P. J., and Haning, J., concurred.

A petitionfor a rehearing was denied December 30, 1997, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied March 18, 1998.