Filed 4/8/25  P. v. Lampkin CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>DEVAN LAMPKIN,<br><br>     Defendant and Appellant. | B333485<br><br>(Los Angeles County<br>Super. Ct. No. BA483705) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Sam Ohta, Judge.  Affirmed.

Judith Kahn, under appointment by the Court of Appeal; Christine M. Aros, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Michael C. Keller and Blake Armstrong, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

A jury convicted Devan Lampkin of second degree murder and found true the allegation he personally used a deadly or dangerous weapon in committing the murder. Lampkin argues that the trial court erred in excluding as hearsay a statement he made to police following his arrest, that substantial evidence did not support his conviction for second degree murder, and that the court abused its discretion in denying his motion under *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*) to strike his prior serious or violent felony conviction. Because none of his arguments has merit, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Lampkin Kills Homer Montez Garcia*

Lampkin began 2020 with a cup of coffee on New Year's Day at a 24-hour Mexican restaurant in downtown Los Angeles. Lampkin sat at the bar, "minding his own business," for an hour or more. Lampkin had been homeless for about 10 years and kept a pocketknife for protection. After drinking his coffee for a while, Lampkin set his knife on the counter to get it "off the side of [his] waistband."

Around that time Homer Montez Garcia came into the restaurant and appeared intoxicated. He sat at the counter about four seats away from Lampkin and ordered breakfast. After Garcia received his food a woman walked into the restaurant, briefly placed a box near Garcia, spat at the floor, and said something to Garcia that might have been racist or might have been a request for food. Garcia told the woman to leave,

2

and she did. Garcia became upset, walked over to Lampkin, and said he was unable to have breakfast in peace. Lampkin remained seated and told Garcia to go back to his seat and eat.

Over the next few minutes Garcia and Lampkin argued, with Garcia repeatedly getting up and walking toward Lampkin, and Lampkin repeatedly telling Garcia to sit down. Lampkin said to Garcia, "I'm not talking to you," "I'm still not talking to you," and "Go sit down and finish your food." Garcia slurred his speech and swerved as he walked toward Lampkin. At some point during the argument Lampkin picked up his knife.

Lampkin stood up, and Garcia said, "'Sit the fuck down. I'll fuck you up. . . . If you don't sit down, I'm a fuck you up in here.'" Lampkin testified he was "getting angry" because he kept telling Garcia to leave him alone, but Garcia "wouldn't go sit down." Lampkin said he was scared and did not know if Garcia had a weapon. When Lampkin thought Garcia was "reaching for something," Lampkin "hugged" Garcia, stabbed him in the chest with the knife, and pinned him against the counter. Lampkin "threw [Garcia] to the ground," cleaned his knife, picked up his coffee and a cup of ice, and left the restaurant. The restaurant owner called the 911 emergency operator, and Garcia died at the hospital. A medical examiner determined Lampkin forced the knife blade through one of Garcia's ribs and into his heart.

B.     *Police Arrest and Interview Lampkin*

The Los Angeles Police Department obtained a photograph of Lampkin from the restaurant's video surveillance system and provided it to the media. An off-duty officer saw a news story on television about the stabbing and recognized Lampkin as a homeless person who frequented the downtown branch of the

3

Los Angeles Public Library.  The next day, January 3, 2020, the officer saw Lampkin at the library and arrested him.  Lampkin had shaved his head and beard since the stabbing.

Lampkin waived his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 and told detectives Garcia got "up in [his] face" and said he was going to kick Lampkin's "ass" and "fuck [him] up."  Lampkin said he repeatedly told Garcia that he did not want to talk to him, but Garcia continued to threaten him, and Lampkin said he "couldn't take no more."  Lampkin "wasn't trying to hurt anybody."  Lampkin said he stabbed Garcia only once because he was trying to get Garcia "to back up off of [him]."  Lampkin said that, when Garcia fell, Lampkin "panicked," picked up his stuff, and left.

C.    *A Jury Convicts Lampkin, and the Trial Court Sentences Him*

The People charged Lampkin with first degree murder (Pen. Code, § 187, subd. (a))[1] and alleged that Lampkin personally used a deadly or dangerous weapon in committing the murder (§ 12022, subd. (b)(1)), that he had a prior conviction for a serious or violent felony within the meaning of the three strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), and that he had a prior conviction for a serious felony within the meaning of section 667, subdivision (a)(1).

At trial the People played the surveillance video from the restaurant, from when the woman carrying the box came into the restaurant to when Lampkin stabbed Garcia.  Lampkin testified in his defense.  He admitted that he "poked" Garcia with his knife, but said that he "felt threatened" because he "didn't know

_____

[1]    Undesignated statutory references are to the Penal Code.

4

what [Garcia] was going to come up and do" and he "didn't know what [Garcia] might have had on his waistband in his jacket." Lampkin stated Garcia threatened him several times, saying he was going to kick his "ass," "beat [him] up," and "fuck [him] up."

Lampkin testified he had been homeless for about 10 years and slept on Skid Row. He said a lot of people on Skid Row used drugs and alcohol and could be belligerent and violent. Lampkin said he was verbally threatened every day, had been "jumped," had a knife pulled on him twice, and had a gun pointed at him once. In the last incident, a man told Lampkin that he was "'looking to hurt somebody'" and that he would shoot Lampkin, but another man intervened, and Lampkin walked away. Lampkin had also seen stabbings and shootings, and frequently heard about beatings.

Dr. Kevin Booker, a clinical psychologist who specializes in trauma, diagnosed Lampkin with post-traumatic stress syndrome and testified for the defense. As a result of Lampkin's condition, Dr. Booker stated, Lampkin struggled with "hyperarousal or hypervigilance, meaning that he always was feeling like he needed to be on guard." Dr. Booker said hypervigilance can cause people to perceive threats inaccurately, to "overprepare," and "invariably" to "overreact." Dr. Booker said hypervigilance was "the most debilitating" of the "core symptoms" of post-traumatic stress syndrome because it left people "in constant fear for their personal safety and well-being."

Lampkin admitted Garcia never brandished, or said he had, a weapon. Lampkin also admitted his "first physical contact" with Garcia was stabbing him. Lampkin stated he never tried to get Garcia to stop harassing him by pushing Garcia, slapping him, or hitting him. Lampkin said he believed it was

5

"reasonable to stab someone if they're running their mouth at you" because "[t]alking can turn into a physical situation." Lampkin stated that he was not aiming at any particular part of Garcia's body when he stabbed him, but that he "just reached out." Lampkin said he felt badly after stabbing Garcia and believed Garcia suffered only a "flesh wound." Lampkin, however, admitted that stabbing people in the chest where he stabbed Garcia could kill them. Lampkin said he did not check to see if Garcia was okay after stabbing him and throwing him to the ground.

The jury acquitted Lampkin of first degree murder, convicted him of second degree murder, and found true the allegation he used a deadly or dangerous weapon in committing the murder. In a bifurcated proceeding Lampkin admitted he had a prior conviction from 2000 for committing a lewd or lascivious act on a child under the age of 14 years (§ 288, subd. (a)) that was a serious felony within the meaning of section 667, subdivision (a)(1), and a serious or violent felony within the meaning of the three strikes law.

Lampkin filed a motion under section 1385 and *Romero*, *supra*, 13 Cal.4th 497 to strike his prior serious or violent felony conviction under the three strikes law and to dismiss the sentence enhancement under section 667, subdivision (a)(1). Lampkin argued that his prior conviction was remote in time and that, in the 20 years since the conviction, he had committed only two misdemeanors and one non-violent felony before committing the current offense. The misdemeanors were for second degree commercial burglary (§ 460, subd. (b)) in 2005 and soliciting or engaging in "lewd or dissolute" conduct in a public place (§ 647, subd. (a)) in 2013, both of which resulted in short sentences in

6

county jail.  The non-violent felony was for failure to register as a sex offender (§ 290, subd. (b)) in 2015, which led to a 32-month sentence.[2]  Lampkin also argued that he killed Garcia in an impulsive act influenced by his "time on the street" and that he expressed remorse for his actions.  Lampkin argued that, if the court dismissed the prior serious or violent felony conviction and five-year enhancement, he still would not be eligible for parole until he was 69 years old.

The court dismissed the five-year sentence enhancement under section 667, subdivision (a)(1), but denied Lampkin's motion under *Romero*.  Regarding the latter ruling, the court stated Lampkin's prior serious or violent felony conviction, which involved his 12-year-old stepdaughter, was for conduct within the spirit of the three strikes law.  The court found the current conviction was also within the spirit of the three strikes law because Lampkin armed himself before standing up from the counter, even though Garcia did not brandish a weapon, and because Lampkin "surprise-attacked" Garcia, "killing him and leaving him to die on the floor of the restaurant."  The court also found Lampkin was a danger to public safety because he had become more violent as he aged and he had killed a stranger in a restaurant merely for "disrespect[ing]" him.  The court also observed Lampkin's prison term for failure to register as a sex offender did not deter him from committing murder several years later.  The court sentenced Lampkin to a prison term of 31 years to life (15 years to life, doubled under the three strikes law, plus one year for using a deadly or dangerous weapon).  Lampkin timely appealed.

---

[2]     Before his 2000 conviction, Lampkin was convicted of petty theft (§ 488) in 1994

## DISCUSSION

A. *The Trial Court Did Not Err in Excluding Lampkin's Postarrest Hearsay Statements to Police*

1. *Relevant Proceedings*

As stated, Lampkin testified at trial. On cross-examination the prosecutor asked Lampkin if he stayed to talk to the police after stabbing Garcia. Lampkin said, "No." The prosecutor asked, "According to you, this guy had threatened you, and you felt like you needed to defend yourself; so why not stop and talk to the police?" Lampkin said there was no reason. The prosecutor also asked Lampkin whether he shaved his head and part of his beard to change his appearance after learning from the news police were looking for him. Lampkin said he planned to do those things anyway. The prosecutor asked if Lampkin went to the police to tell them what happened after he learned the police were looking for him. Lampkin said, "No."

Before beginning his redirect examination, counsel for Lampkin asked the court to allow her to question Lampkin about his January 3, 2020 interview with police. She argued the prosecutor "opened the door" to testimony about Lampkin's voluntary statements to police about his altercation with Garcia by suggesting that Lampkin did not speak with police before trial and that he fabricated his testimony about the altercation with Garcia for the trial. For example, counsel for Lampkin stated she wanted to elicit Lampkin's statements to police that he stabbed Garcia to get Garcia "off of him," that he felt threatened, that he did not know if Garcia had a weapon, and that, after stabbing Garcia, he "panicked" and left the restaurant. According to

8

counsel for Lampkin, this testimony would counter the prosecutor's insinuation Lampkin fabricated his earlier testimony because the proposed testimony would show that what Lampkin stated at trial was consistent with what he stated to the police.

The prosecutor argued that he did not insinuate Lampkin had not spoken to the police or fabricated his testimony and that, even if he had, Lampkin's statements to the police in his postarrest interview were not admissible as prior consistent statements under Evidence Code section 791 because Lampkin had a motive to fabricate his statements during the police interview. Thus, the prosecutor argued, Lampkin's statements to police did not satisfy section 791, subdivision (b), which requires "the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen." Counsel for Lampkin argued Lampkin did not have a motive to fabricate his statements to police at the time of his interview because Lampkin waived his *Miranda* rights and voluntarily agreed to speak to police detectives, which he did not have to do. Instead, counsel for Lampkin contended, Lampkin did not have a motive to fabricate until the People charged him with murder.

The court agreed with the prosecutor. The court found "from a commonsense perspective" the motive for Lampkin to fabricate arose "at least when he got arrested" (and might have arisen as soon as he stabbed Garcia). Thus, Lampkin's statements to the police did not satisfy the hearsay exception under Evidence Code section 791, subdivision (b).

### 2.     *Applicable Law and Standard of Review*

"Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement is

9

consistent with his testimony at the hearing and is offered in compliance with [Evidence Code] Section 791." (Evid. Code, § 1236.) As relevant here, section 791, subdivision (b), makes a prior consistent statement admissible where it is offered after (1) "[a]n express or implied charge has been made that [the witness's] testimony at the hearing is recently fabricated" and (2) "the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen." The parties dispute only the second, temporal requirement of this exception. "We review a trial court's ruling on a hearsay objection for an abuse of discretion." (*People v. Portillo* (2023) 91 Cal.App.5th 577, 588; see *People v. Navarro* (2021) 12 Cal.5th 285, 325 [no abuse of discretion where the trial court excluded prior consistent statements as hearsay].)

### 3. *The Trial Court Did Not Abuse Its Discretion in Ruling Lampkin Had a Motive To Fabricate When He Was Arrested*

As the trial court recognized, a defendant generally has a motive to fabricate his or her story following arrest. In *People v. Navarro*, *supra*, 12 Cal.5th 285 the trial court excluded statements the defendant, who had been an informant for the Federal Bureau of Investigation, made to a police detective after the defendant was jailed following his arrested for murder. (*Id.* at pp. 298, 324.) Like Lampkin, the defendant in *Navarro* testified at trial and wanted to use his out-of-court statements to bolster the truth of his testimony. (*Id.* at p. 325.) The Supreme Court held the statements were inadmissible under Evidence Code section 791, subdivision (b), because "[b]y the time of defendant's arrest . . . , a motive for fabrication had plainly

10

arisen." (*Navarro*, at p. 325; see *People v. Hitchings* (1997) 59 Cal.App.4th 915, 921 [hearsay statements were not admissible under section 791, subdivision (b), where the defendant's "arrest provided a motive for bias or fabrication"].)[3]

Citing *People v. Brents* (2012) 53 Cal.4th 599, Lampkin argues a prior consistent statement is admissible so long as the prior statement is made before the witness testified at trial. *Brents* does not say that. In *Brents* the Supreme Court held the temporal requirement of Evidence Code section 791, subdivision (b), was satisfied because the implied charge of fabrication was based on the witness's preliminary hearing testimony, and the witness made the prior consistent statement before the preliminary hearing. (*Brents*, at p. 616.) Moreover, Lampkin's argument would make every prior consistent statement made before trial admissible, which is not what section 791, subdivision (b), says. (See *People v. Fayed* (2020) 9 Cal.5th 147, 200 ["'[I]f the consistent statement was made after the time the improper motive is alleged to have arisen, the logical thrust of the evidence is lost and the statement is inadmissible.'"]; Cal. Law Revision Com. com., West's Ann. Evid. Code (2025) foll. § 791 [same].)

---

[3] Lampkin argues *People v. Hitchings, supra*, 59 Cal.App.4th 915 is distinguishable because the defendant in that case did not testify at trial. The court in *Hitchings*, however, held Evidence Code section 791, subdivision (b), did not apply for two reasons: (1) the defendant did not testify at trial and (2) he had a motive to fabricate after his arrest. (See *Hitchings*, at p. 921.)

11

B.   *Substantial Evidence Supported Lampkin's
Conviction for Second Degree Murder*

1.   *Applicable Law and Standard of Review*

"Second degree murder is an unlawful killing with malice aforethought, but without the premeditation or deliberation required for first degree murder.  [Citation.]  Malice may be express or implied.  [Citation.]  Malice is express when a defendant intends to kill and implied when a defendant consciously disregards danger to human life.  [Citation.]  Implied malice requires proof of both a physical act and a mental state.  Physically, a defendant must perform an act whose natural consequences are dangerous to life, or put another way, [the] defendant must perform "'an act that involves a high degree of probability'" of death.  [Citations.]  To establish the mental state required for implied malice, the defendant must deliberately perform the act with a conscious disregard for life, knowing the act endangers another's life."  (*In re Ferrell* (2023) 14 Cal.5th 593, 600; see *People v. Knoller* (2007) 41 Cal.4th 139, 143, 151, 156-157; *People v. Gudiel* (2024) 107 Cal.App.5th 848, 859.)

To prove implied malice, "an act that will certainly lead to death is not required," but "the probability of death from the act must be more than remote or merely possible."  (*People v. Cravens* (2012) 53 Cal.4th 500, 513; see *People v. Superior Court (Valenzuela)* (2021) 73 Cal.App.5th 485, 500.)  "'Phrased in everyday language, the state of mind of a person who acts with conscious disregard for life is, "I know my conduct is dangerous to others, but I don't care if someone is hurt or killed."'"  (*People v. Murphy* (2022) 80 Cal.App.5th 713, 726.)  "Implied malice can exist even if the act results in an accidental death.  [Citation.]

12

And like all other elements of a crime, implied malice may be proven by circumstantial evidence." (*People v. Superior Court (Valenzuela)*, at p. 502; see *Murphy*, at p. 726.)

"'In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one.' [Citation.] We 'evaluate the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*People v. Lagunas* (2023) 97 Cal.App.5th 996, 1004; see *People v. Cravens*, *supra*, 53 Cal.4th at p. 507.) "We must 'view the evidence in the light most favorable to the People' and 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.] We must also 'accept logical inferences that the jury might have drawn from the circumstantial evidence.'" (*People v. Flores* (2020) 9 Cal.5th 371, 411; see *Lagunas*, at p. 1004.) "In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181; accord, *Lagunas*, at p. 1004.)

### 2. *Substantial Evidence Supported the Jury's Finding of Implied Malice*

As a preliminary matter, Lampkin argues substantial evidence must support findings of both implied and express malice. Lampkin relies on *People v. Guillen* (2014) 227 Cal.App.4th 934, which indeed states that, where "the record does not disclose which theory the jury relied on in convicting

13

[a defendant] of second degree murder," a reviewing court "must determine whether there was sufficient evidence supporting [the] second degree murder conviction[ ] under each theory of second degree murder." (*Id.* at pp. 982-983.) Here, the trial court instructed the jury with CALJIC Nos. 8.11 and 8.30 that second degree murder is the unlawful killing of a human being with malice aforethought and that malice may be express or implied. The court also instructed the jurors with CALJIC No. 8.74 that, if they found Lampkin guilty of an unlawful killing, they had to unanimously agree whether he was guilty of murder in the first or second degree, but the court did not instruct the jurors that they had to agree on a theory of malice.[4]

The court in *Guillen*, however, misstated the law, at least as applied to this case.[5] The jury did not have to unanimously agree on a theory of malice to find Lampkin guilty of second degree murder. (See *People v. Brown* (1995) 35 Cal.App.4th 708, 715 ["[r]ather than defining different mens reas . . . express and implied malice are really a shorthand way of denoting the requisite mental state for murder known as malice aforethought," and "the jury was not required to unanimously agree on its theory of malice in finding [the defendant] guilty of second degree murder"]; see also *People v. Russell* (2010) 50 Cal.4th 1228, 1256 [jury need not unanimously decide whether the defendant committed premeditated first degree murder or first degree

---

[4]     Nor does Lampkin contend he requested such an instruction.

[5]     In *People v. Guillen, supra,* 227 Cal.App.4th 934 the trial court instructed the jury on three theories of murder: implied malice, aiding and abetting, and conspiracy. The court did not instruct the jury on express malice. (*Id.* at p. 982.)

14

murder by lying in wait].)  Express and implied malice "are not distinct elements of the crime but are instead merely distinct means of committing the offense."  (*Russell*, at p. 1256; see *Schad v. Arizona* (1991) 501 U.S. 624, 636 [the prosecution need not prove beyond a reasonable doubt every "enumerate[d] alternative means of committing a crime" that do not "define separate elements or separate crimes"]; *People v. Williams* (2013) 56 Cal.4th 630, 682, fn. 31 ["although 'a jury must unanimously agree that the defendant is guilty of the statutory offense of first degree murder beyond a reasonable doubt . . . it need not decide which of several proffered theories of first degree murder liability governs the case'"]; *People v. Majors* (1998) 18 Cal.4th 385, 408 ["'as long as each juror is convinced beyond a reasonable doubt that defendant is guilty of murder as that offense is defined by statute, it need not decide unanimously by which theory he is guilty'"].)  Thus, we need only decide whether substantial evidence supported at least one theory of second degree murder. (See *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 168 ["'"reversal is not necessary when the court can determine from the record that the verdict rested on a theory which is supported by sufficient evidence"'"]; *People v. Holt* (1997) 15 Cal.4th 619, 671 [same]; see also *People v. Clark* (2011) 52 Cal.4th 856, 1003 ["Because we can ascertain from the record that the first degree murder verdict rested on a theory supported by substantial evidence, we need not reach the issue whether there was sufficient evidence supporting the alternate theory of premeditation and deliberation."].)

Substantial evidence supported the jury finding Lampkin acted with implied malice.  Regarding the physical act requirement of implied malice, Lampkin admitted that stabbing

15

a person in the chest could cause death. And the evidence showed that, far from merely "poking" Garcia with a knife, Lampkin drove the knife into Garcia's chest with sufficient force to penetrate a rib. Moreover, without warning, Lampkin attacked Garcia, who Lampkin said was swerving as he walked and having a hard time standing up.[6] Stabbing an unarmed drunk person without provocation is akin to a "sucker punch" that catches a victim at his most vulnerable and, along with the severity of stabbing someone in the chest, supported the finding Lampkin's act was dangerous to human life. (See *People v. Cravens*, *supra*, 53 Cal.4th at pp. 509-510 [physical component of implied malice satisfied where the victim was unaware he needed to defend himself against a forceful punch]; *People v. Palomar* (2020) 44 Cal.App.5th 969, 977 [same].)

Regarding the mental state requirement of implied malice, the jury could reasonably infer from Lampkin's conduct and his testimony that he deliberately stabbed Garcia in the chest knowing it would endanger Garcia's life. Lampkin and one of the restaurant workers testified Lampkin "hugged" Garcia before stabbing him and pinned him against a counter, from which the jury could have inferred Lampkin could aim his knife at Garcia's chest. And as stated, Lampkin said he knew stabbing people in the chest can kill them. Moreover, Lampkin did not show concern for Garcia's condition or seek help for him. (See *People v. Cravens*, 53 Cal.4th at p. 511 [defendant's failure to determine the victim's condition or secure emergency assistance supported the finding of implied malice]; *People v. Palomar*, *supra*, 44 Cal.App.5th at p. 978 [same].) To the contrary, Lampkin

---

[6] A blood analyst testified at trial Garcia's blood alcohol concentration at the time of his death was at least .26.

16

testified he "threw [Garcia] to the ground" before picking up his cup of coffee and a cup of ice and leaving the restaurant.

Lampkin argues stabbing Garcia "only" once after Garcia "hovered over him and assailed him while [Lampkin] remained on his stool drinking coffee" negated the mental state necessary for implied malice. Lampkin cites *People v. Spring* (1984) 153 Cal.App.3d 1199, where the court held "one punch" that was too weak to knock the victim off his feet or render him unconscious was not "an act involving 'a high degree of probability that it [would] result in death.'" (*Id.* at p. 1205, italics omitted.) But by finding Lampkin guilty of second degree murder, the jury rejected Lampkin's defense he did not act with a conscious disregard for human life because he had an actual but unreasonable belief he needed to defend himself from Garcia. And a single stabbing, especially to the chest, is substantially more dangerous to human life than a single punch. Viewing the evidence in the light most favorable to the verdict, substantial evidence supported the jury's finding Lampkin deliberately stabbed Garcia knowing that act endangered Garcia's life and with a conscious disregard for it.

C.    *The Trial Court Did Not Abuse Its Discretion in Denying Lampkin's Motion Under* Romero

Lampkin argues the trial court abused its discretion in refusing to dismiss his 20-year-old prior serious or violent felony conviction. He also argues that courts considering *Romero* motions should take into consideration the goals of recently passed sentencing reform legislation and that the trial court's ruling conflicted with those goals. Neither argument has merit.

17

The trial court has discretion under section 1385, subdivision (a), to dismiss in furtherance of justice a serious or violent felony conviction for purposes of sentencing a defendant under the three strikes law.  (*Wheeler v. Appellate Division of Superior Court* (2024) 15 Cal.5th 1193, 1206; *People v. Clancey* (2013) 56 Cal.4th 562, 582; *Romero, supra*, 13 Cal.4th at p. 530.)  "In deciding whether to dismiss a prior strike, a court considers 'whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies.'"  (*People v. Brugman* (2021) 62 Cal.App.5th 608, 636-637; see *People v. Williams* (1998) 17 Cal.4th 148, 161 (*Williams*).)

"We review a trial court's ruling on a *Romero* motion under the deferential abuse of discretion standard, which requires the defendant to show that the sentencing decision was irrational or arbitrary."  (*People v. Avila* (2020) 57 Cal.App.5th 1134, 1140; see *People v. Carmony* (2004) 33 Cal.4th 367, 375; *People v. Brugman, supra*, 62 Cal.App.5th at p. 637.)  "It is not enough to show that reasonable people might disagree about whether to strike one or more prior conviction[s].  Where the record is silent, or where the record demonstrates that the trial court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law, we shall affirm the trial court's ruling, even if we might have ruled differently in the first instance.  Because the circumstances must be extraordinary . . . by which a career criminal can be deemed to fall outside the

18

spirit of the very scheme within which he squarely falls once he commits a strike as part of a long and continuous criminal record, the continuation of which the law was meant to attack, the circumstances where no reasonable people could disagree that the criminal falls outside the spirit of the three strikes scheme must be even more extraordinary." (*Carmony*, at p. 378, cleaned up.)

The trial court did not abuse its discretion in denying Lampkin's request to dismiss his prior serious or violent felony conviction. The "remoteness of a prior conviction, 'by itself, cannot be a basis for dismissing a prior strike conviction.'" (*People v. Dowdy* (2024) 107 Cal.App.5th 1, 12; see *People v. Dain* (2024) 99 Cal.App.5th 399, 415-416, review granted May 29, 2024, S283924; see also § 667, subd. (c)(3) ["the length of time between the prior serious or violent felony conviction and the current felony conviction shall not affect the imposition of sentence"]; *People v. Strong* (2001) 87 Cal.App.4th 328, 342 [section 667, subdivision (c)(3), "suggests, at a minimum, that remoteness alone cannot take a defendant outside the spirit of the very law that expressly rejects remoteness as a basis for avoiding the law"].) Instead, an old conviction may deserve judicial forgiveness when it becomes a "'pivot point'" for the defendant's reform. (*Dain*, at p. 416.) Lampkin, however, did not reform. Even after committing a violent felony in 2000 (see § 667, subd. (d)(1) [defining as violent felonies the offenses listed in section 667.5, subd. (c)]; § 667.5, subd. (c)(6) [listing a violation of section 288, subdivision (a), as a violent felony]), he committed second degree commercial burglary, solicited or engaged in lewd conduct, failed to register as a sex offender, and served several additional prison terms before committing the current, violent

19

offense. Contrary to Lampkin's suggestion, that he managed not to commit more violent crimes while living on the streets for 10 years does not take him outside the spirit of the three strikes law.

Lampkin also argues the "spirit" behind sentencing reform legislation such as section 1385, subdivision (c), which requires a trial court to consider certain enumerated factors in deciding whether to dismiss a sentence enhancement in the interests of justice,[7] supports his contention the trial court abused its discretion in refusing to dismiss his 20-year-old violent felony conviction. Lampkin acknowledges that no court has applied section 1385, subdivision (c), or its "spirit" to the three strikes law,[8] but he asserts that a decision whether to dismiss a

---

[7]     Lampkin also cites section 745 (the California Racial Justice Act of 2020); Senate Bill No. 775 (2020-2021 Reg. Sess.), which amended former section 1170.95, now section 1172.6, and expanded the scope of potential relief; Senate Bill No. 136 (2019-2020 Reg. Sess.), which amended section 667.5, subdivision (b), to limit prior prison term enhancements to prior prison terms for sexually violent offenses; Senate Bill No. 1437 (2017-2018 Reg. Sess.), which amended sections 188 and 189 to eliminate the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder; and Senate Bill No. 620 (2017-2018 Reg. Sess.), which amended section 12022.53, subdivision (h), to give courts discretion to strike firearm enhancements under section 1385.

[8]     Every court that has considered the issue has held that, because "subdivision (c) of section 1385 applies only to an 'enhancement,'" and because the three strikes law is not an enhancement, section 1385, subdivision (c), does not apply to the three strikes law. (*People v. Burke* (2023) 89 Cal.App.5th 237,

---

sentencing enhancement is comparable to a decision whether to dismiss a prior serious or violent felony conviction because in both instances (Lampkin says) a court must consider whether "the defendant's circumstances indicate he or she should be deemed to fall outside the spirit of the statutory sentencing scheme."

The Supreme Court in *Williams*, *supra*, 17 Cal.4th 148, however, held the trial court, in determining whether to dismiss a prior conviction for a serious or violent felony under the three strikes law, can consider only "factors intrinsic to the scheme, such as the nature and circumstances of the defendant's present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects." (*Id.* at pp. 160-161; see *People v. Garcia* (1999) 20 Cal.4th 490, 494, 498-499 [applying *Williams* to the defendant's *Romero* motion].) And section 1385, subdivision (c), includes several factors extrinsic to the scheme underlying the three strikes law, such as the consequences for a defendant in a particular case. (See *Williams*, at p. 161 ["no weight whatsoever may be given to factors extrinsic to the scheme, such as . . . bare antipathy to the consequences for any given defendant"].) For example, in determining whether to dismiss a sentence enhancement, section 1385, subdivision (c), requires a court to consider whether applying the enhancement would result in a sentence of over 20 years. (§1385, subd. (c)(2)(C).) Under

---

244; see *People v. Dowdy*, *supra*, 107 Cal.App.5th at pp. 9-10; *People v. Killian* (2024) 100 Cal.App.5th 191, 217; *People v. Dain*, *supra*, 99 Cal.App.5th at p. 411, review granted; *People v. Olay* (2023) 98 Cal.App.5th 60, 66-67; *People v. Tilley* (2023) 92 Cal.App.5th 772, 776, fn. 2.)

21

*Williams* that is not a permissible factor to consider in determining whether to grant a defendant's motion under *Romero*. Thus, the goals of the recent sentencing reform legislation Lampkin identifies, such as reducing long prison sentences and ending racial disparity in sentencing, are not intrinsic to the scheme underlying the three strikes law, and the trial court may not consider them in ruling on a *Romero* motion.

## DISPOSITION

The judgment is affirmed.

SEGAL, J.

We concur:

MARTINEZ, P. J.

STONE, J.